Peoples, P. E. E. P. L. E. S. Good afternoon, your honors. Can everybody hear me? Yes. Ms. Harrington? Yes. May it please the court. I am Jillian Harrington, and I was assigned by this court to represent Joseph Peoples on this direct appeal. I did not represent Mr. Peoples in the district court below. Actually, Mr. Peoples, who is not an attorney, represented himself at this trial. As your honors are, of course, aware, we raised four I'm sorry? I think you can go ahead. Oh, okay. I thought I heard somebody. I'm sorry. As your honors are, of course, aware, we raised four issues in Mr. Peoples' appellant brief. The first issue is whether the district court erred in his handling of the government's violation of Rule 5C of the Federal Rules of Criminal Procedure. And since that was the first issue, that's where I'll begin my comments today. There can be no doubt that Rule 5C was violated here. It requires that a criminal defendant be brought before a magistrate court in the district where the defendant is arrested, or in an adjacent district, if the appearance can occur more promptly in that district, or if the offense was allegedly committed there and the initial appearance will occur on the same day of the arrest. This case didn't fall into any of those categories of exceptions. Mr. Peoples was arrested in Binghamton, New York, which, of course, is in the Northern District of New York. But the crime allegedly occurred at the Chase Bank, which was located in Rochester, New York, which is located in the Western District of New York. And he was kept in the Northern District overnight, and then returned to the Western District the following day and brought before a magistrate judge about 19 hours after his arrest at the hotel. There was no explanation ever offered by the government for the delay or the failure to bring him before a magistrate in the Northern District. In fact, to this day, no explanation has ever been offered. It's just the way that they did it. And it was during that overnight stay in Binghamton, before they returned him to Rochester, that he was interrogated by officers. And during that interrogation, he made some very inculpatory statements. Now, those statements were actually used by the agents in the affidavit that they submitted to get the search warrant for his room at the Grand Royal Hotel. Now, the government argued, and the district court agreed, that there was no harm to Mr. Peoples because the government agreed not to use those inculpatory statements that he had made during that interrogation at trial. They never said why they were agreeing to use it, but presumably it was because they realized that they would have been suppressed anyway. They just sent a letter to the court saying that they wouldn't use them without any explanation. But to say that that doesn't matter because they were not used at trial completely disregards the fact that those statements were used in the complaint and the agent's search warrant affidavit. Now, it's true that there was other information that was included in the search warrant about what witnesses had said and about money that was found in various locations that they claimed had been stolen from the Chase Bank in Rochester. But none of them, none of those witnesses, had identified Mr. Peoples as the person who robbed the Chase Bank. So they were able to use these statements to get that search warrant. And it was from that search warrant that a plethora, a treasure trove of evidence was found in the hotel room. So to make a kind of a no harm, no foul argument for the violation of this important rule because they didn't use those it's important. And just turning to another... Excuse me. Harmless error is sometimes frustrating, but no harm, no foul is the law, isn't it? It is. It is. But in this case, I don't think they can make that argument, or at least it's not a strong argument because those inculpatory statements, which included, you know, yeah, it was me basically, was used in the search warrant application. And it was those statements that were relied upon by the judge in granting that search warrant. And it was... Can I ask a question? Normally where there's a problem, it can be a false statement, it can be an agent misbehaving or whatever, that would result in suppression. You look at the sort of tainted information and see if there was probable cause. That's the normal rule. I think it's the Frank case. And then you can... And if there is no probable cause, once you've redacted any of the questionable material, then the search is suppressed. But if there still is probable cause at that point, after the bad material is excised, then there's no suppression of the so-called fruit of the poisonous tree. Is that what you're understanding? Yes, Your Honor. I mean, that would be the suppression type of rule. But this, I think, just goes a little bit further because... You're saying that the... I think you're saying that the materials seized in the search warrant, pursuant to the search warrant, were, in effect, fruit of the poisonous tree because the affidavits were bad because they contained the information that peoples had given to the officers that should have been suppressed or that maybe... That would have been suppressed otherwise. And so let's assume you're right and that those affidavits were used. But then we would look to see whether there was other material in the affidavits sufficient to yield probable cause once those particular statements of the defendant were removed. And that's what I'm getting at. If that's your understanding of the way that courts should proceed under these circumstances. Yes, Your Honor. That would be my argument. And I think it's kind of a basic law school fruit of the poisonous tree type of argument. Right. But once you're finished with that process, then the question is, was there enough in the affidavits? And my understanding was that surveillance was very clear and provided probable cause about the evidence about the defendant now and who he was and that he committed the crime, et cetera, et cetera. Am I missing something on that? Well, I mean, I guess that would be... You have one more minute. Thank you. But that would be the crux of the argument is whether or not that would be true. I mean, there were no identifications, as we know, because another issue that we raised here was that the in-court identification was what the government had relied on for the Chase and Bank employees. There was some other evidence about seeing somebody on video at the various bus stations, money that was left, but there was no fingerprint analysis. There was nothing really tying him to it. And his statements really put everything kind of over the top. I think once the judge saw that he confessed and his other statements, I think it was pretty much a done deal for them. But we're talking about the affidavits, aren't we? Talking about the affidavits for the search. And was the material concerning the surveillance videos in those affidavits, was that information in the affidavits? Yes, I believe that it was. The affidavit is included in our appendix. I accidentally closed my book of the appendix when I was reading it earlier, but it definitely is in there. So your honors can definitely see. And yes, there was definitely some other evidence in there pointing in the direction of Mr. Peoples. That's definitely true. And if your honors have no further questions, I would be happy to rely on my brief. I see I've gone over my time. I hope that you all stay safe and healthy. You too. Thank you very much. Thank you very much. We'll hear now from Ms. Gregory. Yes, good afternoon. Catherine Gregory, Assistant U.S. Attorney representing the government in this matter. I just want to check, can everyone hear me? Okay, great. I just want to start with where counsel ended with the application for the search warrant. There are very detailed accounts of eyewitness statements, video surveillance, the physical evidence recovered, like the clothing and the tens of thousands of dollars in the trash can on the bus station and the cab that was used as a getaway vehicle. But more than that, there's the fact that the suspect identified himself as Joseph W. Peoples III to the Rochester Quality Inn. He used his own ID when he checked into that hotel when he was trying to shake law enforcement pursuit. So almost that on its own, I think, would be enough to establish probable cause. But we also have the rest of the law enforcement investigation detailed in that application. That is also included in the government appendix. I think we're on page eight is when you get to the non-interview statement. So even if this court reviews the application de novo, excising the post-arrest interview, this would surely be sufficient to demonstrate probable cause. But I would like to turn to the in-court identification. Even if any of the appellant's arguments have merit, the errors were harmless in the face of the overwhelming evidence of guilt in this case. He left incriminating evidence every step of the way from Rochester to Binghamton, as I noted, thousands of dollars in cash, half a dozen eyewitnesses, several of whom identified him at trial beyond just tellers, each of which was evidentiary breadcrumbs for police to follow. The district court's decision not to use any special procedures for that in-court identification fell within the bounds of its discretion. This court has directly held in Brown and again in Archibald that it's the defendant's prerogative to request a pretrial lineup if he's concerned about the subjectivity of an in-court ID, and Peoples did not do that here. He knew in advance that the government intended to have witnesses identify him if they were able, and he failed to request a lineup. As this court emphasized in Archibald, district courts are under no obligation to stage what is effectively a lineup inside the courtroom. And the totality of the circumstances here indicates there was little risk of misidentification. For example, there's no evidence that say he was the only African American man in the courtroom, as was the case in Archibald, or that witnesses were merely guessing that the perpetrator would be seated at the defense table, again like happened in Archibald. None of those indicia are present here. These witnesses were 100% sure of their identification. They said his image was, quote, drilled into my head for the rest of my life, quote, and that he, quote, never left my side the whole robbery, quote. One of the tellers even identified him by voice without being asked. So these were not hesitant witnesses prone to misidentification. On the contrary, police here actually did conduct a show-up on the day of the robbery with a different suspect who matched the general description, and even under those circumstances, in the heat of the moment right after the robbery, with a look-alike presented to her by police officers, Mr. Riosa said, no, that's not him. So the appellant's decision not to request a pretrial lineup, I submit he was a vet on his part, and the district court's decision not to stage a lineup during witness testimony was within its discretion. And even if it were an abuse, the error was harmless. As we noted, even without the bank teller IDs, the appellant still left a trail a mile wide for police as he dropped thousands of dollars into the Rochester cab where he made his initial getaway, more thousands of dollars in the Greyhound bus station trash can where he was caught on surveillance. He was caught on surveillance at numerous locations, and when he was finally caught red-handed with almost $50,000 from the Shanks Bank vault, among other incriminating evidence, which I detailed at page 9 of our brief. So even if it were manifest error to permit the in-court IDs, it was harmless in the light of the sheer volume. You refer to that as a trail of breadcrumbs? Yes, I did at one point, yes. Okay, go ahead. It was harmless in light of the other evidence. I call it breadcrumbs, but it quite literally was a trail of video evidence and surveillance and excellent detective work on the part of law enforcement who recognized the cabbies from their beat work and were able to speak with them within hours of the occurrences. So they did apprehend Mr. Peoples within, I think, less than 24 hours of the robbery, just because they were able to follow the surveillance, the eyewitness statements, the literal cash that was dropped along the way. And if the panel has other questions about other areas or other issues that were raised, I'd be happy to answer them. Judge Walker? No, no thanks. And Judge Sack? No, sir. Great. Thank you very much. So then we have, Ms. Harrington had a bit of extra time, I think, and there's no rebuttal time left. So we will take this case on submission with gratitude to both counsel and turn to the-